**ST. LOUIS AIRPORT AUTHORITY— CITY OF ST. LOUIS, Petitioners,**

v.

**CIVIL AERONAUTICS BOARD, Respondent,**

**Northwest Airlines, Inc., Intervenor.**

No. 76–2068.

United States Court of Appeals, Eighth Circuit.

Submitted June 17, 1977.

Decided Aug. 24, 1977.

Richard P. Taylor, Washington, D. C., for petitioners; Jack L. Koehr, City Counselor, St. Louis, Mo., on brief.

David E. Bass, Atty., C. A. B., Washington, D. C., for respondent; James C. Schultz, Gen. Counsel, Jerome Nelson, Deputy Gen. Counsel, Glen M. Bendixsen, Assoc. Gen. Counsel, Robert L. Toomey, Atty., Donald I. Baker, Asst. Atty. Gen., and Carl D. Lawson and James F. Ponsoldt, Attys., Dept. of Justice, Washington, D. C., on brief.

Before MATTHES, Senior Circuit Judge, BRIGHT, Circuit Judge, and MILLER, Judge.*

MILLER, Judge.

Petitioners seek reversal of Civil Aeronautics Board ("CAB" or "board") Order 76–10–33, adopted October 7, 1976, refusing to expand the scope of its Seattle/Portland—Japan Service Investigation to include consideration of the City of St. Louis as a coterminal point for nonstop service to Japan or for one-stop service via a coterminal already designated; also remand of the

* The Honorable Jack R. Miller, Judge, U. S. Court of Customs and Patent Appeals, sitting by designation.

case with directions that the board "accord St. Louis the single-plane service opportunity it has given every other interested city in the proceeding." The petition is "denied.

### Background

The investigation was instituted[1] as a result of a number of applications seeking a new transpacific combination passenger and cargo service, including a petition by St. Louis, Dallas/Fort Worth, Las Vegas, New Orleans, and Seattle for direct air service to Japan and a petition by Portland, Oregon, for direct air service to Japan, Korea, and the People's Republic of China. The instituting order stated:

In determining the scope of this investigation, we have been persuaded by the fact that the petitions requesting an immediate transpacific proceeding focus primarily upon Seattle, on the one hand, as the U.S. gateway point for transpacific service, and upon Japan, on the other hand. Because of its traffic flow potential and geographic location, Seattle is a logical city for consideration of additional Japan authority. It is ideally situated to garner the traffic necessary to support such service and it can easily serve as a focal point for flowing transpacific traffic generated from interior points.

The order also stated:

We will not consider additional U.S. points for coterminal status since the traffic-generating capability and geographic location of those other cities seeking coterminal status render it unlikely that new nonstop service to Japan would be viable from these points. [Footnote omitted.]

And further:

If a new carrier is authorized to provide Seattle-Japan service, it will be free to tack such authority onto its existing system and provide single-plane [through flight] service opportunities to interior U.S. points. Thus, even though coterminal status for interior U.S. points will not be considered, the issues in this case will allow all interested carrier and civic parties ample opportunity to present evidence demonstrating the need for single-plane service to the Orient from interior U.S. cities by means of tacking a Seattle-Japan route onto the route system of any applicant carrier.

Various petitions for reconsideration were filed, including petitions by St. Louis and Portland. Only Portland's petition was granted, the CAB saying in Order 76–2–44, adopted February 12, 1976:

Portland's petition for reconsideration properly points out that the concept of tacking cannot improve Portland's service to Japan as no traveler is going to proceed to Portland, change flights and continue on to Seattle, and then change again in Seattle when he could have proceeded directly to Seattle in the first place and thus eliminated a stop and/or change of planes. Portland has usually been considered as a traditional coterminal point with Seattle and we have concluded that it should be designated as a coterminal point in this proceeding.[2]

In its petition for reconsideration, St. Louis pointed out that the only carrier available to St. Louis for tacking a St. Louis-Seattle route onto a Seattle-Japan route was Eastern Air Lines and that Eastern had no interest in obtaining a Seattle-Japan route. However, Order 76–2–44 did not respond to this point and merely stated that its previous order (Order 75–12–84)

---

1. CAB Order 75–12–84, adopted December 17, 1975, instituted the investigation, stating that its purpose was "to determine whether additional U.S.-flag service should be authorized between the coterminal point [of] Seattle, Washington, and points in Japan." The proceeding was designated "Seattle Gateway—Japan Service Investigation."

2. This order also changed the name of the investigation to "Seattle/Portland-Japan Service Investigation." Order 76–10–33, which petitioners seek to reverse, states:

The inclusion of Portland as a separate coterminal point rested largely on grounds which are not applicable to any other potential coterminal point—namely, geographic location and historical treatment as a coterminal point with Seattle.

pointed out that all interested carrier and civic parties would have "ample opportunity to present evidence demonstrating the need for single-plane service to the Orient from interior U.S. cities by means of tacking a Seattle-Japan route onto the route system of any applicant carrier." Accordingly, a petition for review was filed with this court. Admitting that it was mistaken over the opportunity of St. Louis to obtain single-plane service in the proceeding, the CAB moved that the case be remanded so that it could explain the criteria it used to determine the scope of the proceeding and assess the materiality of its mistake. The motion was granted, and further proceedings culminated in Order 76–10–33.

### OPINION

The dispositive issue is whether the CAB's refusal to expand the scope of its Seattle/Portland-Japan Service Investigation to include consideration of various St. Louis proposals was an abuse of discretion.

Petitioners argue that their treatment by the board is "so unnecessarily unfair as to amount to arbitrary and capricious agency action under Section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706." They state the gravamen of their complaint as follows:

> The point of this whole matter is that there were six cities who originally requested coterminal status from the Board. *No other cities applied then or later.* Of these six cities the Board granted coterminal status to two (Seattle and Portland), accorded single-plane beyond service opportunities to three (Dallas/Fort Worth, Las Vegas and New Orleans) and denied any chance for direct

service only to one—St. Louis. And when that one city tried in a spirit of compromise to propose a limited, reasonable way to meet its needs and not be left out in the cold, its proposal was first totally ignored and then, on remand, preemptorily [sic] brushed aside.

Notwithstanding this statement, we observe that Order 76–10–33 makes it clear that the single-plane service "opportunities" of Dallas/Fort Worth, Las Vegas, and New Orleans will not necessarily be realized:

> It should be noted . . . that even the inclusion of a Seattle-Japan application by a carrier which could tack such authority and offer service to interior U.S. points does not guarantee that a city will in fact receive such service since the decision to tack authority is discretionary with the applicant. Las Vegas, for example, which was denied coterminal status, could receive single-plane service to Japan if new service is authorized and Western is the applicant selected for the route at issue. Western, however, has not proposed to provide Japan-Las Vegas single-plane service.

 Although admitting that, during the proceedings on remand, St. Louis had requested the board to consider designating it as a coterminal (as had been done for Portland), petitioners emphasize that "the basic thrust" of their request for relief has been a one-stop service from St. Louis via a coterminal already designated.[3] They complain that the board in its denial of relief under Order 76–10–33 "spoke only in terms of coterminal nonstop service designation" of St. Louis and did not reveal the reasons for rejecting its alternative proposals.[4] On

---

**3.** Two alternatives to nonstop coterminal status were presented to the board:

1. Designate a West Coast terminal (Los Angeles or San Francisco) in the proceeding through which St. Louis can be served.
2. Place single-plane service from St. Louis to Seattle in issue in the case with a requirement that the service be operated on a long-haul basis to the Orient . . . . .

Petitioners argue that the latter is "quite simple and limited" and "involves allowing a carrier to apply for St. Louis-Seattle rights which it could

tack onto a Seattle-Tokyo route." We are not persuaded that such an alternative is so "simple." Eastern Air Lines would almost certainly object if Northwest, for example, sought St. Louis-Seattle authority. In any event, rationality of the administrative decision is what is to be assessed in an abuse-of-discretion case—not the error or unwisdom of the decision. *American Tel. & Tel. Co. v. United States*, 299 U.S. 232, 236, 57 S.Ct. 170, 81 L.Ed. 142 (1936).

**4.** We note that in their reply brief petitioners state that "St. Louis has conceded nothing in

the contrary, that order states: "as set forth in our original order, this case is narrowly focused on the issue of whether or not Seattle could serve as a gateway for additional nonstop service to the Orient." This is a reasonable response to petitioners' alternative of designating Los Angeles or San Francisco in the proceeding. With respect to petitioners' alternative of placing single-plane service from St. Louis to Seattle in issue, Order 76–10–33 states:

> Nor would it be appropriate to our basic purpose to expand the case by . . . placing in issue the award of new St. Louis-Seattle authority (subject to a long-haul restriction) as requested by St. Louis.

As pointed out in note 1, *supra*, the purpose of the proceeding was "to determine whether additional U.S.-flag service should be authorized between . . . Seattle, Washington, [and Portland, added later], and points in Japan." We agree with the board that the issue of the ability and willingness of a carrier to provide St. Louis-Seattle service (subject to a long-haul restriction) is not material to that purpose;[5] also, that the board need not structure a proceeding to equalize the beyond-market capabilities of all applicants. *See Delta Air Lines v. CAB*, 162 U.S.App.D.C. 21, 497 F.2d 608 (1973), *cert. denied*, 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974); *National Airlines v. CAB*, 129 U.S.App.D.C. 180, 392 F.2d 504 (1968); *City of San Antonio v. CAB*, 126 U.S.App.D.C. 112, 374 F.2d 326 (1967).

▪ With respect to petitioners' bid for nonstop coterminal status, Order 76–10–33 explains:

To be sure, we anticipated that, in accordance with ordinary Board procedures, interested persons would be allowed to present evidence that a particular applicant should receive new Seattle-Orient nonstop authority because such applicant could, as a by-product, provide new single-plane service to various interior U.S. cities. We also appreciate that Eastern's failure to apply for Seattle-Orient authority precludes St. Louis from making such a presentation to the Board. However, the fact that a particular city, such as St. Louis, cannot, as a result of this case, receive single-plane service would not have caused us—and does not now cause us—to enlarge the case so as to add that city as a gateway eligible to receive new nonstop service. . . . There are scores of cities, after all, which would be "eligible" for inclusion as separate coterminals if inability to receive single-plane service were a relevant criterion and application of such a criterion would hopelessly expand every proceeding.[6]

We are well persuaded that Order 76–10–33 is properly responsive to the various St. Louis proposals.

Another point relied upon by petitioners is that "the Board so obviously had its mind made up in advance to exclude St. Louis no matter what that it even juggled its original coterminal selection criteria around to justify the result." Thus, petitioners say that, in its instituting Order 75–12–84, the board employed essentially two criteria in limiting coterminal designation to Seattle: "overall traffic-generating capacity and geographic location";[7] whereas, the order

---

its need for coterminal status and nonstop Japan service" and that "Coterminal status was St. Louis' principal request before the Board."

**5.** Therefore, careless and frustrating as was the board's mistake in failing (in its Order 76–2–44) to be responsive to petitioners' point that Eastern was not interested in obtaining a Seattle-Japan route, the mistake was harmless error vis-á-vis the Seattle/Portland-Japan Service Investigation.

**6.** By way of example, the board pointed out that Omaha receives service to Seattle only from Eastern, so that inclusion of St. Louis

would arguably require inclusion of Omaha as well.

**7.** As quoted from the instituting order earlier in this opinion, these two criteria were relied upon by the board in excluding other interested cities, thus:

> the traffic-generating capability and geographic location of those other cities seeking coterminal status render it unlikely that new nonstop service to Japan would be viable from these points.

here under review (76–10–33) states "the Board's basic criteria for limiting the proceeding to Seattle and Portland" as follows:

> their geographic position, the prior public convenience and necessity findings regarding Pacific Northwest-Orient nonstop service, and (in the case of Seattle) the ability to generate sufficient nonstop traffic and (in the case of Portland) historic treatment as a coterminal point with Seattle.

Petitioners contend that only the first of such criteria (geographic position) was originally applied as a basis for selection of communities to be nonstop coterminals. However, we are satisfied that the criterion of "the ability to generate sufficient nonstop traffic" is merely a restatement of "overall traffic-generating capacity" in context in Order 75–12–84. Petitioners say that "historic treatment as a coterminal point with Seattle" was "mentioned but seemingly not relied upon as controlling in the reconsideration Order 76–2–44 which added Portland." We do not so read Order 76–2–44 and we note that Order 76–10–33 specifies the criteria of geographic location and historical treatment for the inclusion of Portland (note 2, *supra*). It is true that the board, in reconsideration Order 76–2–44, responded to Portland's point that "the concept of tacking cannot improve Portland's service to Japan," but this does not make the tacking point a material issue in this proceeding or render the response the basis for the board's decision to include Portland as a coterminal with Seattle. As to the prior public convenience and necessity findings regarding Pacific Northwest-Orient nonstop service, these were referred to in the instituting order and do not constitute "new criteria" as argued by petitioners.

We conclude that petitioners' "juggling of criteria" argument is without merit.

In view of all the foregoing, we hold that the board's refusal to expand the scope of its Seattle/Portland-Japan Service Investigation to include consideration of the St. Louis proposals was not an abuse of discretion.

The petition is denied.